# United States Court of Appeals
## For the First Circuit

---

No. 00-2357

GUN OWNERS' ACTION LEAGUE, INC.; OUTDOOR MESSAGE COOPERATIVE, INC.; MASSACHUSETTS SPORTSMEN'S JUNIOR CONSERVATION CAMP INC.; A.G. GUNS & AMMO, INC.; MARK COHEN; JOHN DOE II; JAMES F. GETTENS; DANA H. CROWE; LORI CROWE; BRIAN E. DUNN; JOHN P. HEARSON; TOM LAROCHE; ANN D. LAROCHE; ROBERT L. WALTER; JOHN DOE I; GOAL FOUNDATION, INC.,

Plaintiffs, Appellants,

v.

JANE SWIFT, Acting Governor, Commonwealth of Massachusetts; THOMAS F. REILLY, Attorney General, Commonwealth of Massachusetts; JOHN DIFAVA, Colonel, Massachusetts State Police; MARTHA COAKLEY, District Attorney, Middlesex County, MA; EDWARD DAVIS, Superintendent, Police Department, Lowell, MA,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George O'Toole, U.S. District Judge]

---

Before

Torruella and Lipez, Circuit Judges,
and Zobel,* District Judge.

---

Stephen P. Halbrook, with whom Edward F. George, Jr. was on brief for appellants.
Edward J. DeAngelo, Assistant Attorney General, with whom Thomas F. Reilly, Attorney General of Massachusetts, and Adam Simms, Assistant Attorney General, were on brief for appellees.

*Of the District of Massachusetts, sitting by designation.

<u>Edward L. Morris</u> on brief for appellee Edward Davis.
<u>Michael Paris</u>, <u>Benjamin S. Albert</u>, <u>Randall E. Ravitz</u>, and <u>Brown Rudnick Freed & Gesmer</u>, on consolidated brief for The Center to Prevent Handgun Violence, the International Brotherhood of Police Officers, the American Academy of Child and Adolescent Psychiatry, the American Association of Suicidology, the American Medical Student Association, the American Public Health Association, the Massachusetts Brain Injury Association, and Stop Handgun Violence, Inc., <u>amici curiae</u>.

March 25, 2002

**LIPEZ, <u>Circuit Judge</u>**.  This case requires us to consider the constitutionality of "An Act Relative to Gun Control in the Commonwealth," a law that placed new restrictions on guns classified as "Large Capacity Weapons," and increased the penalties for unlicensed possession.  1998 Mass. Acts ch. 180, §§ 1-80 (codified in Mass. Gen. Laws ch. 140 <u>et</u> <u>seq.</u>) ("Act").  Plaintiffs allege that the Act is unconstitutional because of the vagueness of important definitions within the Act.  They allege the same infirmity in a related furnishing statute.  They also assert that the Act's regulation of certain gun clubs violates their rights to freedom of expression, equal protection and freedom of association.  In response to the Commonwealth's motion to dismiss, the district court dismissed all of the counts.  We affirm.

## I. Background

## A. Provisions of the Act

Given the facial challenge to the 1998 gun control law, we must describe the law in some detail.

## 1. Licensing of "Large Capacity Weapons"

Owners of firearms in the Commonwealth of Massachusetts have long needed to license these weapons.  <u>See</u> 1906 Mass. Acts 172 (requiring license for carrying loaded pistol).  Before the Act went into effect, a two-tiered licensing system prevailed, based on the categories of (1) rifles and shotguns and (2) "firearms," including pistols, revolvers, and other guns with short barrels.  Mass. Gen. Laws ch. 140, § 121

(1997).  A citizen with a license could possess all these weapons, while a citizen with a Firearms Identification Card ("FID Card") could only possess rifles and shotguns.  Mass. Gen. Laws ch. 140, §§ 121, 129C, 131 et seq. (1997).

The Act created a three-tiered licensing system by devising a new classification for large capacity weapons.  Mass. Gen. Laws ch. 140, § 121.  A Class A license entitles its possessor to own any type of weapon, including a large capacity weapon.  Mass. Gen. Laws ch. 140, § 131(a).  A person with a Class B license can possess only weapons, be they rifles, shotguns, or firearms, that are not large capacity weapons.  Mass. Gen. Laws ch. 140, § 131(b).  A person with an FID Card has the same rights as someone with a Class B license except that he or she cannot carry firearms.  Mass. Gen. Laws ch. 140, § 129C.  Again, firearms are pistols, revolvers, and guns with short barrels.  Id.

The Act defines a "large capacity weapon" as "any firearm, rifle or shotgun:

> (i) that is semiautomatic with a fixed large capacity feeding device; (ii) that is semiautomatic and capable of accepting, or readily modifiable to accept, any detachable large capacity feeding device;  (iii) that employs a rotating cylinder capable of accepting more than ten rounds of ammunition in a rifle or firearm and more than five shotgun shells in the case of a shotgun or firearm; or (iv) that is an assault weapon.

Mass. Gen. Laws ch. 140, § 121.  A "large capacity feeding device" is:

> (i) a fixed or detachable magazine, box, drum, feed strip or similar device capable of accepting, or that can be readily

converted to accept, more than ten rounds of ammunition or more than five shotgun shells; or (ii) a large capacity ammunition feeding device as defined in the federal Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. § 921(a)(31).

Id. The statute also excludes certain weapons from the definition of large capacity weapons:

> The term "large capacity weapon" shall be a secondary designation and shall apply to a weapon in addition to its primary designation as a firearm, rifle or shotgun and shall not include: (i) any weapon that was manufactured in or prior to the year 1899; (ii) any weapon that operates by manual bolt, pump, lever or slide action; (iii) any weapon that is a single-shot weapon; (iv) any weapon that has been modified so as to render it permanently inoperable or otherwise rendered permanently unable to be designated a large capacity weapon; or (v) any weapon that is an antique or relic, theatrical prop or other weapon that is not capable of firing a projectile and which is not intended for use as a functional weapon and cannot be readily modified through a combination of available parts into an operable large capacity weapon.

Id.

## 2. The Roster of Large Capacity Weapons

To ensure that its prohibitions are clarified as needed, the Act provides that the Secretary of the Executive Office of Public Safety ("Secretary") shall publish and distribute a "roster" of weapons which fit the statutory definition of "large capacity weapons." Mass. Gen. Laws ch. 140, § 131 3/4. The Secretary has compiled and published the roster. The roster is presently available on the web site of the

Executive Office of Public Safety.[1]  The first roster was issued on October 14, 1998, one week before the effective date of the Act.

The roster is not intended as an exhaustive list of weapons deemed "large capacity" under the terms of the Act, but it does list dozens of weapons considered "large capacity weapons" under the Act.  Executive Office of Public Safety, Large Capacity Weapon Roster Effective February 15, 2002.  The Secretary also prefaced the roster with clarifications of some elements of the statutory definition of large capacity weapons, including the terms "capable of accepting" and "readily modifiable to accept" a large capacity feeding device.  Id.

**3. The Licensing Process**

Anyone seeking a Class A or B license may apply either to the local chief of police or the Colonel of the State Police.  Mass. Gen. Laws ch. 140, § 131(d).  The licensing authority may issue the license if 1) the applicant is not automatically disqualified by reasons listed in the statute (such as prior conviction of certain crimes) and 2) the licensing authority determines that the applicant is a "suitable person" and has reason for the license.  Id.  A person seeking an FID card may apply to the local chief of police.  Mass. Gen. Laws ch. 140, § 129B.  The chief of police must issue the license unless a listed reason disqualifies the applicant.  Id.  Anyone denied either a Class

---

[1] See http://www.state.ma.us/eops/download/large_cap.pdf (last visited Feb. 20, 2002).

A or B license or an FID card may challenge that denial in the courts of the Commonwealth.  Mass. Gen. Laws ch. 140, §§ 129B(5), 131(f).

**4. Criminal Provisions**

Both before and after the Act, anyone who "knowingly" possessed weapons without proper state licensing could be punished by imprisonment.  Mass. Gen. Laws ch. 260, § 10(a) (1997).  The Act provided for a specific term of punishment for knowing unlicensed possession of a large capacity weapon: between two-and-a-half and ten years in prison.  Mass. Gen. Laws ch. 269, § 10(m).  The Act also increased existing penalties for firearms dealers who sell weapons to persons who do not have the license necessary to possess such weapons. Mass. Gen. Laws ch. 269, § 10F.

The Act also amended existing restrictions on the selling or furnishing of weapons to persons under a certain age.  Massachusetts law prohibits selling or furnishing a rifle or shotgun to anyone under the age of 18, and prohibits selling or furnishing a firearm or large capacity weapon to anyone under 21 years of age. Mass. Gen. Laws ch. 140, § 130.  The Act updated the furnishing statute so that it would reflect the new three-tier licensing scheme. Id.  It also increased the penalties for selling or furnishing such weapons to underage individuals.  Id.

**5. Class A-Licensed Gun Clubs**

Like individuals, organizations (such as gun clubs) can also possess weapons. There is no statutory requirement that a gun club not using large capacity weapons obtain a license. However, a gun club which possesses and stores large capacity weapons must obtain a Class A license. According to the Act, a gun club with a Class A license can possess, store, and use large capacity weapons. Mass. Gen. Laws ch. 140, § 131(a). A member of a Class A-licensed gun club may use large capacity weapons, even if the member does not possess a Class A license, provided that the member has at least a Class B license or an FID card. Id. A Class A licensed gun club can permit non-members without a license or an FID card to use large capacity weapons, provided that such non-members fire under the supervision of a certified firearms safety instructor or a properly licensed club member. Id.

Gun clubs which want to possess and store large capacity weapons must apply to the Colonel of the State Police in order to obtain a Class A license. Id. According to the statute, "[t]he colonel of state police may, after an investigation, grant a Class A license to a club or facility with an on-site shooting range or gallery . . . provided, however, that not less than one shareholder of such club shall be qualified and suitable to be issued such license." Id.

The Act also regulates target-shooting at Class A-licensed clubs. Plaintiffs challenge a regulation preventing such gun clubs from

permitting "shooting at targets that depict human figures, human effigies, human silhouettes or any human images thereof, except by public safety personnel performing in line with their official duties." Id. A person lawfully licensed and shooting in a place where it is lawful to fire weapons (other than a Class A-licensed club) may shoot at a target depicting a human figure.

**B. The Plaintiffs and their Challenges to the Act**

The sixteen plaintiffs who have filed suit to enjoin enforcement of the Act may be divided into three classes. The business plaintiffs, all of whom are licensed by the Commonwealth of Massachusetts and the United States as firearms dealers, are A.G. Guns & Ammo, Inc., Mark Cohen (d/b/a The Powderhorn), and John Doe II (a state trooper). The individual plaintiffs include an attorney, an engineering manager, parents of juveniles involved in shooting sports, software engineers, a minister, and retired Army officers (one of whom is disabled and participates in wheelchair competitive shooting). Four Massachusetts corporations are associational plaintiffs: the Gun Owners Action League ("GOAL") (which consists of 9,000 individuals and 200 clubs), Outdoor Message Cooperative, Inc. (which publishes a newspaper for GOAL members), the Masachusetts Sportsmen's Junior Conservation Camp, Inc. (which trains youth in outdoor skills, including shooting), and GOAL Foundation, Inc. (which promotes gun safety programs for children).

These businesses, individuals, and associations have challenged the constitutionality of the Act by suing the Governor and Attorney General of Massachusetts, and other officials who enforce it. Their original complaint consisted of ten counts. The district court granted the defendants' motion to dismiss with respect to all ten counts. Appellants appeal only the dismissal of Counts 1, 3, 4, 6, and 10. The counts may be grouped as follows:

**Vagueness Counts:** Count 4 alleges that the Act's definition of a large capacity weapon is unconstitutionally vague; Count 6 alleges the same regarding the Act's definition of large capacity feeding device. The plaintiffs claim that these vague definitions leave thousands of gun owners in Massachusetts unable to determine whether they need to license their guns as large capacity weapons. Count 10 alleges that the Act's definition of "furnishing" weapons and ammunition to persons under 21 is also vague.

**Freedom of Expression Count:** Count 1 alleges that the Act's "censorship of target images violates free speech and equal protection." The statute prohibits shooting at human-shaped targets or human images at Class A gun clubs. The plaintiffs believe that this regulation either is designed to curtail the expressive conduct of shooting at human images, or, even if not intended to do so, nevertheless impermissibly limits that conduct.

**Equal Protection and Freedom of Association Count:** Count 3 alleges that restricting Class A licenses to "incorporated clubs with shareholders. . . . irrationally discriminates against incorporated clubs without shareholders and their members and violates the right to freedom of association."  The plaintiffs allege that the shareholder requirement bears no rational relationship to the statute's purported aims.  They also argue that the "Act offends freedom of association by granting special privileges to members of stock-corporation clubs and denying such privileges to persons who are not members of such clubs and cannot obtain a Class A license."

## C. The Decision Below

The District Court dismissed appellants' vagueness challenge on ripeness grounds, finding that "none of these claims is ripe as to any of the plaintiffs."  The court added that, even if ripe, the vagueness challenges were not "meritorious" because "the definitions for the purposes of the Act's licensing requirements do not regulate or limit constitutionally protected conduct . . . . [and are] not impermissibly vague in all applications."[2]  The district court dismissed the freedom of expression claim (Count 1) on the ground that the Act regulated

_____

[2] The Supreme Court has held that a facial vagueness challenge to a statute may only succeed if the plaintiff "demonstrate[s] that the law is impermissibly vague in all of its applications." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 497 (1982) (upholding anti-drug paraphernalia ordinance); see also Whiting v. Town of Westerly, 942 F.2d 18, 21-22 (1st Cir. 1991) (upholding town ban on sleeping in public place).

conduct, not speech. It also summarily dismissed the freedom of association claim (Count 3) "for the reasons the defendants have pointed out;" namely, that gun clubs do not need to obtain Class A licenses and that Class A licenses do not require their possessors to espouse any viewpoint. "We will affirm the dismissal of the complaint if, and only if, accepting all well-pleaded facts as true and drawing all reasonable inferences in favor of the plaintiff, the complaint 'fail[s] to state a claim upon which relief can be granted.'" Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co., 228 F.3d 24, 30 (1st Cir. 2000) (quoting Fed. R. Civ. P. 12(b)(6)). Therefore, "the complaint is properly dismissed only when the allegations are such that 'the plaintiff can prove no set of facts to support [the] claim for relief.'" Id. (quoting Rockwell v. Cape Cod Hosp., 26 F.3d 254, 260 (1st Cir.1994)). We review below each element of the dismissal, considering the vagueness challenges in Part II, the First Amendment challenge to the prohibition on shooting at human-shaped targets in Part III, the equal protection challenge to the licenses for Class A gun clubs and facilities in Part IV, and the freedom of association claim in Part V.

**II. Vagueness**

In appealing the dismissal of the vagueness counts (Counts 4, 6, 10), the appellants argue that they cannot determine whether they own the types of weapons regulated by the Act, putting them at risk of a

-13-

violation of a criminal law.  Hence, they claim that the statutory prohibitions on owning large capacity weapons and furnishing weapons to persons under 21 are facially unconstitutional.

The first statutory definition of a large capacity weapon is "any firearm, rifle or shotgun: (i) that is semiautomatic with a fixed large capacity feeding device."[3] Mass. Gen. Laws ch. 140, § 121.  The Act further defines a "large capacity feeding device" to include a magazine or similar device "capable of accepting, or that can be readily converted to accept, more than ten rounds of ammunition or more than five shotgun shells." Id. According to their complaint, "[s]everal plaintiffs . . . possess semiautomatics with fixed tubular feeding devices that accept no more than 10 rounds of the ammunition they

---

[3] A "firearm" is defined in the statute as

> a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16 inches or 18 inches in the case of a shotgun as originally manufactured; provided, however, that the term firearm shall not include any weapon that is:  (i) constructed in a shape that does not resemble a handgun, short-barreled rifle or short-barreled shotgun including, but not limited to, covert weapons that resemble key-chains, pens, cigarette- lighters or cigarette-packages;  or (ii) not detectable as a weapon or potential weapon by x-ray machines commonly used at airports or walk- through metal detectors.

Mass. Gen. Laws ch. 140, § 121. A "rifle" is a weapon having "a rifled bore with a barrel length equal to or greater than 16 inches and capable of discharging a shot or bullet for each pull of the trigger." Id. A "Shotgun" is a weapon having "a smooth bore with a barrel length equal to or greater than 18 inches with an overall length equal to or greater than 26 inches, and capable of discharging a shot or bullet for each pull of the trigger."  Id.

possess or no more than five of the shotgun shells they possess. However, such persons have no way of knowing if these feeding devices will accept more rounds or shells of shorter lengths." In other words, the plaintiffs complain that they cannot determine the scope of the definition without ascertaining (and continuing to ascertain) the exact dimensions of available ammunition.

The second statutory definition of large capacity weapon includes any weapon "that is semiautomatic and capable of accepting, or readily modifiable to accept, any detachable large capacity feeding device." Id. According to the plaintiffs:

> The term "capable of accepting" a feeding device that will accept more than ten rounds could be interepreted at least five ways: (1) the owner must actually possess such a device; (2) the owner does not possess the device, but the weapon as manufactured and sold included such a device; (3) such a device is not possessed but is available in the ordinary channels of commerce; (4) such a device is not available but someone on the planet has made at least one; or (5) no such device has ever been made, but would fit the weapon if it existed and was possessed by the owner.

The plaintiffs argue that they could only comply with the statute if it made clear which of these five interpretations is correct.

## A. Ripeness Doctrine

When citizens cannot determine what conduct a law proscribes, the law's vagueness may raise constitutional due process concerns. "The constitutional requirement of definiteness is violated by a criminal

statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." United States v. Harriss, 347 U.S. 612, 617 (1954).  The principle underlying the doctrine is that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."  Id.

Alleging that the Act is unconstitutionally vague, the plaintiffs complain about the threat of enforcement, but not any particular instances of enforcement.  Such facial challenges raise special justiciability concerns.  Particularly relevant here is the doctrine of ripeness, which "asks whether an injury that has not yet happened is sufficiently likely to happen" to warrant judicial review.  13A Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper, Federal Practice and Procedure, § 3531.12, at 50 (2d ed. 1984) (citing Warth v. Seldin, 422 U.S. 490, 499 n.10 (1975) (defining ripeness inquiry as "whether the harm asserted has matured sufficiently to warrant judicial intervention.")).  The requirement of ripeness is "particularly relevant in the context of actions for preenforcement review of statutes," because it "focuses on the timing of the action." Navegar, Inc. v. United States, 103 F.3d 994, 998 (D.C. Cir. 1997).

In determining ripeness, we apply a familiar test: "'the question in each case is whether . . . there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy

-16-

and reality to warrant the issuance of a declaratory judgment.'" <u>Lake Carriers' Assn.</u> v. <u>MacMullan</u>, 406 U.S. 498, 506 (1972) (quoting <u>Maryland Casualty Co.</u> v. <u>Pacific Coal & Oil Co.</u>, 312 U.S. 270, 273 (1941)).  There are several important reasons for a court to exercise the "passive virtue"[4] of waiting for a controversy to mature before passing judgment on the merits:

> [C]ourts should not render decisions absent a genuine need to resolve a real dispute.  Unnecessary decisions dissipate judicial energies better conserved for litigants who have a real need for official assistance. . . . Defendants, moreover, should not be forced to bear the burdens of litigation without substantial justification, and in any event may find themselves unable to litigate intelligently if they are forced to grapple with hypothetical possibilities rather than immediate facts.

Wright, Miller, and Cooper, § 3532.1, at 114-5; <u>see</u> <u>also</u> <u>United States</u> v. <u>Hilton</u>, 167 F.3d 61 (1st Cir. 1999) (declining to entertain overbreadth challenge to the Child Online Privacy Protection Act for similar reasons).  These concerns often militate against preenforcement review.

Nevertheless, threats of enforcement of a vague statute can support a facial challenge to a statute when certain conditions are met. "'[O]ne does not have to await the consummation of threatened injury to obtain preventive relief.  If the injury is certainly impending that is enough.'"  <u>Babbitt</u> v. <u>United Farm Workers Nat'l</u>

---

[4] <u>See</u> Alexander Bickel, <u>The Least Dangerous Branch</u> 111 (1962).

*Union*, 442 U.S. 289, 298 (1979) (quoting <u>Pennsylvania</u> v. <u>West Virginia</u>, 262 U.S. 553, 593 (1923)); <u>see</u> <u>also</u> Wright, Miller & Cooper, § 3532.5, at 183 (explaining that the opportunity to offer a constitutional defense at a criminal proceeding "simply is not an adequate remedy."). To determine whether the threat of enforcement of an allegedly vague statute is ripe for judicial review, we examine "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." <u>Abbott Labs.</u> v. <u>Gardner</u>, 387 U.S. 136, 149 (1967). "[F]itness typically involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed, whereas hardship typically turns upon whether the challenged action creates a direct and immediate dilemma for the parties." <u>Rhode Island Ass'n of Realtors, Inc.,</u> v. <u>Whitehouse</u>, 199 F.3d 26, 33 (1st Cir. 1999) (internal quotation marks omitted). We turn to these hardship and fitness considerations.

**1. Hardship**

In all of the vagueness counts, the main hardship alleged by the plaintiffs is the threat of prosecution. A threatened prosecution is only immediate enough to satisfy the hardship prong of the ripeness inquiry when "the challenged action creates a 'direct and immediate' dilemma for the parties." <u>W.R. Grace & Co.</u> v. <u>United States Envtl. Prot. Agency</u>, 959 F.2d 360, 364 (1st Cir., 1992) (quoting <u>Abbott Labs.</u>,

-18-

387 U.S. at 152 (1967)). Such a dilemma exists when threatened prosecution puts the party seeking preenforcement review "between a rock and a hard place--absent the availability of preenforcement review, she must either forego possibly lawful activity because of her well-founded fear of prosecution, or willfully violate the statute, thereby subjecting herself to criminal prosecution and punishment." Navegar, 103 F.3d at 998 (citing Babbitt, 442 U.S. at 298-99). The plaintiffs allege that they face such a dilemma because they must choose between costly compliance (giving up possession of all guns that might be large capacity weapons) or risky noncompliance (keeping their guns and worrying about prosecution for possessing large capacity weapons).

That argument might have some force if the Act banned large capacity weapons outright instead of licensing them. For example, in People's Rights Organization, Inc. v. City of Columbus, 152 F.3d 522 (6th Cir. 1998), where the plaintiffs challenged succesfully on vagueness grounds a municipal ordinance banning assault weapons, the preenforcement challenge was ripe for review because the law presented those plaintiffs with a "Hobson's choice[:] [t]hey [could] either possess their firearms in Columbus and risk prosecution under the City's law, or, alternatively, they [could] store their weapons outside the City, depriving themselves of the use and possession of the

weapons."[5] <u>People's Rights Org.</u>, 152 F.3d at 529 (holding that city ordinance's ban on assault weapons was vague because the ordinance lacked a scienter requirement and its definitions of assault weapons, <u>inter</u> <u>alia</u>, unfairly required gun consumers to ascertain the developmental history of particular weapons or monitor the precise types of ammunition available for their weapons). Here, the plaintiffs have a third option: obtaining a license for their weapons.[6]

Confronted with this licensing argument, the plaintiffs respond that they do not know whether they need a license. However, we have long held that all owners of firearms are on notice that they are subject to regulation, including licensing. <u>See</u> <u>United States</u> v. <u>DeBartolo</u>, 482 F.2d 312, 316 (1st Cir. 1973) (internal quotation marks

---

[5] In <u>Nat'l Rifle Assoc.</u> v. <u>Magaw</u> 132 F.3d 272 (6th Cir. 1997) the same court ruled that the facial challenge of certain gun manufacturers to the federal Crime Control Act of 1994 was ripe because of the economic harms suffered by businesses which sold guns. Like the Columbus ordinance, the Crime Control Act also lacked a licensing scheme, making <u>Magaw</u> distinguishable for the same reasons.

[6] The plaintiffs cite only one case in which a facial challenge to a state licensing scheme for guns has been held ripe. <u>Coalition of New Jersey Sportsmen, Inc.</u> v. <u>Whitman</u>, 44 F. Supp.2d 666, 673 n.10 (D.N.J. 1999). Although this case ultimately repudiated the type of challenge they propose here, the plaintiffs rely upon it because of its justiciability holding. Again, the case is distinguishable. The New Jersey law examined in <u>Coalition</u> was effectively a ban on assault weapons. As an earlier decision evaluating the New Jersey law stated, "the prohibition is de facto [because of the] . . . . extremely rigorous qualification process required for receiving a license." <u>Coalition of New Jersey Sportsmen</u> v. <u>Florio</u>, 744 F.Supp. 602, 608 (D.N.J. 1990). The plaintiffs have never alleged that the Massachusetts licensing process amounts to a <u>de facto</u> ban.

omitted) (rejecting a gun transferor's due process challenge to a conviction for transferring a gun without a license because "where, as here . . . dangerous or deleterious devices . . . are involved, the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation").  Here, the regulation of large capacity weapons provides a process for resolving uncertainty about the scope of the regulation--the application for a license.  The hardship alleged by the plaintiffs--being forced to dispose of possibly lawful weapons or risking prosecution under the statute--dissolves in light of that licensing option.

## 2. Fitness

The fitness component of ripeness addresses whether the factual and legal dimensions of the challenge to the Act are developed enough to permit adjudication of the plaintiffs' claim.  The Act empowers an agency of the Commonwealth--the Executive Office of Public Safety ("EOPS")--to promulgate regulations clarifying its meaning and to publish a list of weapons proscribed by the statute.  Mass. Gen. Laws ch. 140, § 131 3/4.  The statute charges the EOPS to publicize these clarifications widely:

> The secretary shall, not less than three times annually, publish the roster in newspapers of general circulation throughout the commonwealth, and shall send a copy thereof to all dealers licensed in the commonwealth under the provisions of said section 122 of said chapter 140;  and further, the licensing authority

shall furnish said roster to all cardholders and licensees upon initial issuance and upon every renewal of the same.

Id.

The statute also provides for citizen input into the process of promulgating and updating the roster: "The secretary may amend the roster upon his own initiative or with the advice of [the Gun Control Advisory Board]. A person may petition the secretary to place a weapon on, or remove a weapon from, the roster, subject to the provisions of this section." Id. The Gun Control Advisory board, appointed by the Governor, has seven members, "one of whom shall be a member of the Gun Owners Action League." Mass. Gen. Laws ch. 140, § 131 ½. Thus, one of the members of the board must be a representative from the lead associational plaintiff in this case, GOAL. Id..

Both the clarifying language and the roster assist law enforcement officers and laymen in interpreting the statute. For example, the plaintiffs complain that the term "'capable of accepting' does not inform the owner whether she must actually possess the feeding device, or whether the manufacture, somewhere in the world, of some feeding device that her gun is capable of accepting" would suddenly render the gun a large capacity weapon (and thus require its owner to obtain a Class A license). The clarifying language issued with the roster addresses this question:

"Capable of accepting" shall mean any firearm, rifle or shotgun in which a large capacity feeding device is capable of being used

-22-

without alteration of the weapon; provided, however, that said large capacity feeding device is fully or partially inserted into the weapon or attached thereto, or is under the direct control of a person who also has direct control of a weapon capable of accepting said feeding device.

Executive Office of Public Safety, Large Capacity Weapon Roster Effective February 15, 2002, <u>available</u> <u>at</u> <u>http://www.state.ma.us/chsb/download/frb/largecap 2002.pdf</u>. Similar administrative clarifications may well answer other questions raised by the plaintiffs. Observing a similar clarification process on the federal level, the Sixth Circuit in <u>Magaw</u>, 132 F.3d 272 (6th Cir. 1997), refused to review a statute (18 U.S.C. § 926) similar to the Massachusetts law challenged by the plaintiffs, in part because the plaintiffs there had not given the relevant rulemaking authority a chance to clarify the statute:

> [T]he Crime Control Act delegates rulemaking authority to the Secretary of the Treasury. The Secretary, in turn, has delegated that authority to the BATF, which has the authority to make rules designating in greater specificity the requirements of the statute . . . . We believe a federal court should not intervene and determine whether a statute enacted by Congress is unconstitutionally vague on its face before the agency with rulemaking authority has had an opportunity to interpret the statute.

<u>Id.</u> at 292. This reasoning applies to the Act as well. The process of administrative clarification, begun even before the Act took effect,

has continued during the pendency of this litigation.[7] We see no basis for precluding future good faith efforts by professionals in the Executive Office of Public Safety to clarify the statute.

In summary, the opportunity for licensing minimizes the alleged hardship, and the continuing administrative clarification of the Act reduces uncertainty. Neither Count Four nor Count Six is ripe for review.

**B. Prohibitions on "Furnishing a Weapon" to a Minor (Count 10)**

Count Ten of the plaintiffs' complaint (alleging that the statutory ban on "furnishing" weapons to a minor is unconstitutionally vague) is also unripe. Massachusetts law has banned the furnishing of weapons to minors for many years. See, e.g., 1884 Mass. Acts 76. Before the Act, the statute banned the furnishing of rifles or shotguns to minors, and set the penalty for "furnishing" such weapons to minors and aliens between $500 and $1,000 (with no provisions for imprisonment). Mass. Gen. Laws ch. 140, § 130 (1997). The Act updated this statutory language to reflect the new three-tier classifications of weapons and increased the penalties for violation:

---

[7] According to the statute, the "secretary may amend the roster upon his own initiative or with the advice of [the Gun Control Advisory] board. A person may petition the secretary to place a weapon on, or remove a weapon from, the roster." Mass. Gen. Laws ch. 140, § 131 3/4. The secretary issued an updated version of the roster as recently as February 15, 2002. See Executive Office of Public Safety, Large Capacity Weapon Roster Effective February 15, 2002, available at http://www.state.ma.us/chsb/download/frb/largecap_2002.pdf.

Whoever . . . sells or furnishes any alien or any person under eighteen years of age a rifle, shotgun, machine gun or ammunition, or whoever sells or furnishes to any person under 21 years of age a firearm or large capacity rifle or shotgun or ammunition therefor shall have his license to sell . . . revoked . . . and shall be punished by a fine of not less than $1,000 nor more than $ 10,000, or by imprisonment in a state prison for not more than ten years or by imprisonment in a house of correction for not more than two and one-half years, or by both such fine and imprisonment.

Mass. Gen. Laws ch. 140, § 130. As it did before the Act, the statute also provides several exceptions for parents and shooting instructors.[8]

In their challenge to Count Ten, the plaintiffs re-allege the vagueness of the term "large capacity weapon." We have already explained why this challenge is unripe for review. To the extent that the plaintiffs' vagueness challenge in Count Ten depends on other arguments, they spend less than one page of a fixty-six page brief developing them. There they only allege that "[d]ue to the vagueness of 'furnishes,' they must either risk prosecution or discontinue teaching marksmanship and safety to the youngsters." They do not

---

[8] "Nothing in this section . . . shall be construed to prohibit a parent or guardian from allowing his child or ward, who has not attained age fifteen, the supervised use of a rifle or shotgun or ammunition therefor . . . nor from furnishing such child or ward, who has attained age fifteen, with a rifle or shotgun that is not a large capacity weapon or ammunition; provided, however, that said child or ward, being fifteen years of age or older, has been issued a valid firearm identification card . . . . Nothing in this section shall be construed to prohibit an instructor from furnishing rifles or shotguns or ammunition therefor to pupils; provided, however, that said instructor has the consent of a parent or guardian of a pupil under the age of eighteen years." Mass. Gen. Laws ch. 140, § 130.

explain why "furnishes" is vague, or suggest the different meanings it might have. Their reply brief is also unhelpful on this issue. These additional furnishing arguments on vagueness grounds are developed so perfunctorily that we deem them waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

The plaintiffs also argue that the furnishing provision violates equal protection because it allows instructors, but not parents, to furnish one under 21 years of age "with a large capacity rifle or shotgun or ammunition therefor," and "no rational relation to any legitimate purpose has been suggested for this discrimination against parents and in favor of instructors." This argument ignores a basic difference between parents and instructors: the latter are subject to detailed training and licensing requirements. Mass. Gen. Laws ch. 140, § 131P. Admittedly, the statute is silent on whether the instructor must supervise the minors after he or she has furnished them with weapons. Nevertheless, the Commonwealth's classification here--permitting instructors, but not parents, to furnish a large capacity weapon to a minor--meets the rational basis test.

**III. Freedom of Expression**

The plaintiffs allege that one provision in the Act unconstitutionally restricts their freedom of expression. According to

the statute, gun clubs with Class A licenses "shall not permit shooting at targets that depict human figures, human effigies, human silhouettes or any human images thereof, except by public safety personnel performing in line with their official duties." Mass. Gen. Laws ch. 140, § 131(a).  The plaintiffs argue that the law "censors images printed on targets . . . for the first time in world history."  One plaintiff, Outdoor Message, Inc., distributes a target with the image of Adolph Hitler on its front, and an account of Hitler's restrictions on firearm use on the back.  Those who buy the target shoot at the image of Hitler in order to express their opposition to tyranny and restrictions on gun use, and other political messages.

First Amendment challenges to proscribed conduct usually require a two-step inquiry; first, assessing whether the proscribed conduct is sufficiently communicative to count as expression protected by the First Amendment, and secondly, whether the challenged law is content-neutral or content-based.  However, a court may sometimes bracket the initial analysis, assume arguendo that the conduct is expressive enough to come within the ambit of First Amendment protection, and then complete the second inquiry.  For example, in  the Supreme Court's seminal treatment of the speech/conduct distinction, the Court decided to "assum[e] for the sake of argument that 'the alleged communicative element in O'Brien's conduct [was] sufficient to bring into play the First  Amendment.'"   Bartnicki  v.  Vopper,  200  F.3d  109,  119

-27-

(3rd Cir. 1999) (quoting <u>U.S.</u> v. <u>O'Brien</u>, 391 U.S. 367, 376 (1968) (upholding the defendant's criminal punishment for burning his draft card)); <u>see</u> <u>also</u> <u>AIDS Action Committee, Inc.</u> v. <u>Massachusetts Bay Transp. Auth.</u>, 42 F.3d 1, 10 (1st Cir. 1994) (assuming "<u>arguendo</u> that the MBTA has correctly characterized the AAC ads as sexually explicit and/or patently offensive, that it has excluded them pursuant to its written Policy, and that it may constitutionally proscribe sexually explicit and/or patently offensive speech in its cars" in order to "decide whether the content discrimination inherent in the MBTA's decision to run the 'Fatal Instinct' ads, while not running the AAC ads, is permissible").

No court has recognized target shooting as a constitutionally protected form of expression. The plaintiffs argue that they are engaged in "expressive conduct," like the flag-burning protected by the Supreme Court in <u>Texas</u> v. <u>Johnson</u>, 491 U.S. 397 (1989). Such conduct is entitled to First Amendment protection when it evinces "[a]n intent to convey a particularized message . . . [and] the likelihood [is] great that the message would be understood by those who viewed it." <u>Id.</u> at 404 (1989) (internal quotation marks omitted). In response to this argument, we follow the lead of <u>O'Brien</u> and <u>AIDS Action Committee</u>, assuming for the purpose of the content-neutral/content-based analysis that the target shooting at human figures described by the defendants

is expressive conduct entitled to some degree of First Amendment protection.

"The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).  Here, the defendants assert that the Act's purpose was to stop target practice that arguably increases the practicer's capacity to shoot human beings, not to prevent the potentially expressive conduct engaged in by some of the plaintiffs.

The plaintiffs argue that the government's expressed interest in preventing gun fatalities is pretextual because the Act "does not ban shooting at all targets, but only at targets printed with disfavored images."  The disfavored images here are images of humans, or targets shaped like humans.  There is an obvious connection between the Commonwealth's interest in preventing gun fatalities and its decision to restrict the shooting practices of certain gun clubs.  A person who has practiced shooting at a human-shaped target will likely be more proficient at shooting humans than a person who has had to practice at a circular target.  This rationale is a believable, reasonable, content-neutral justification for the provision.

The plaintiffs complain that they are specially burdened because they are not allowed to shoot at pictures of tyrants.  However, supporters of tyrants are affected in the same way by the statute: they

cannot shoot at images of advocates of freedom.  The restriction is content-neutral, neither advancing nor impeding any particular viewpoints, but simply regulating a particular mode of potentially expressive conduct (target shooting) at a particular place (Class A-licensed gun clubs).  Of course, the restriction is more likely to burden expressive conduct by those who shoot at targets because such individuals are far more likely to shoot at effigies or images on targets as a form of expression.  Nevertheless, this law, "designed to serve purposes unrelated to the content of protected speech [should be] deemed content-neutral even if, incidentally, it has an adverse effect on certain messages while leaving others untouched."  McGuire v. Reilly, 260 F.3d 36, 43 (1st Cir. 2001).  As in O'Brien, "'the governmental interest is unrelated to the suppression of free expression.'"  Johnson, 491 U.S. at 406 (quoting O'Brien, 391 U.S. at 377.).  Therefore, the restriction here is content-neutral.

Since this restriction on the time, place, and manner of expressive conduct is content-neutral, it "trigger[s] an intermediate type of scrutiny . . . [and] will be upheld as long as [it is] 'narrowly tailored to serve a significant governmental interest, and allow[s] for reasonable alternative channels of communication.'" Knights of Columbus v. Town of Lexington, 272 F.3d 25, 31 (1st Cir. 2001) (quoting Globe Newspaper Co. v. Beacon Hill Architectural Comm'n, 100 F.3d 175, 186 (1st Cir.1996)); see also Ward, 491 U.S. 781, 791

-30-

(1989); <u>Clark</u> v. <u>Community for Creative Non-Violence</u>, 468 U.S. 288, 293 (1984). The restriction does serve a "significant governmental interest." <u>Knights of Columbus</u>, 272 F.3d at 31. It aims to prevent those who do not have a license for using large capacity weapons from refining their skills with such weapons by shooting at targets depicting humans. The state has a particular interest in preventing those unlicensed to use large capacity weapons from becoming proficient at shooting humans with such weapons.[9]

The restriction on shooting at targets depicting human figures is also narrowly tailored. As the defendants observe in their brief, the restriction "applies only in Class A licensed clubs because those are the only places where a person who does not have a license for large capacity weapons may shoot such weapons."

The restriction challenged here "allows for reasonable alternative channels of communication." Whatever messages the appellants seek to

---

[9] The state's interest in regulating Class A licensed clubs also answers the plaintiffs' equal protection challenge to this restriction on human target shooting. The plaintiffs argue that "the provision . . . denies the equal protection of the laws, in violation of the Fourteenth Amendment, by treating persons who are in identical circumstances dissimilarly. Everyone else in the Commonwealth is entitled to shoot at such images except those shooting at a club with a Class A license." However, the Equal Protection Clause of the Fourteenth Amendment "embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly." <u>Vacco</u> v. <u>Quill</u>, 521 U.S. 793, 799 (1997) (citations omitted). Given that <u>only</u> Class A clubs can permit persons generally unauthorized to use large capacity weapons to use such weapons on their premises, it is reasonable that the state's restriction on shooting at human-shaped targets only applies to them.

express by shooting at human images on targets, those messages may be spread via writing, the Internet, word of mouth, or other communication technologies. Similarly, if the destruction of an image of Hitler is the "communication" at issue, they have reasonable alternative channels for defacing that image, by hand or other physical means. If the appellants' message can be conveyed only by shooting at such images, the statute still "leave[s] open ample alternative channels" for disseminating it: they may shoot at such images at any place where they can lawfully shoot at targets, other than gun clubs with a Class A license.

In summary, the Act's provisions on target shooting comply with all constitutional requirements for content-neutral restrictions on speech, and hence pass intermediate scrutiny.

## IV. Equal Protection Challenge to Class A Licensing Provisions

Like individuals, certain clubs and facilities may possess, store, and use large capacity weapons if they successfully apply for a Class A license. Mass. Gen. Laws ch. 140, § 131(a).[10] A club or facility

---

[10] The statute reads as follows:

The colonel of state police may, after an investigation, grant a Class A license to a club or facility with an on-site shooting range or gallery, which club is incorporated under the laws of the commonwealth for the possession, storage and use of large capacity weapons, ammunition therefor and large capacity feeding devices for use with such weapons on the premises of such club; provided, however, that not less than one shareholder of such club shall be qualified and suitable to be issued such license; and provided further, that such large capacity weapons and ammunition feeding

-32-

with a Class A license may permit its members to use its large capacity weapons, even if those members do not individually have Class A licenses, if they have a Class B license or an FID card. Id. A Class A licensed club or facility may also permit non-members to use its large capacity weapons (as long as the non-member uses the large capacity weapon under the supervision of a properly licensed club member or a certified firearms instructor). Id.

Clubs and facilities which want to possess and store large capacity weapons must apply to the Colonel of the State Police in order to obtain a Class A license. Id. According to the statute, "[t]he colonel of state police may, after an investigation, grant a Class A license to a club or facility with an on-site shooting range or gallery . . . provided, however, that not less than one shareholder of such club shall be qualified and suitable to be issued such license." Id. The term "shareholder" here denotes three distinct requirements for

---

devices may be used under such Class A club license only by such members that possess a valid firearm identification card issued under section 129B or a valid Class A or Class B license to carry firearms, or by such other persons that the club permits while under the direct supervision of a certified firearms safety instructor or club member who, in the case of a large capacity firearm, possesses a valid Class A license to carry firearms or, in the case of a large capacity rifle or shotgun, possesses a valid Class A or Class B license to carry firearms. Such club shall not permit shooting at targets that depict human figures, human effigies, human silhouettes or any human images thereof, except by public safety personnel performing in line with their official duties.

Mass. Gen. Laws ch. 140, § 131(a).

clubs or facilities which seek to obtain a Class A license.  First, they must be incorporated.  Second, they must be corporations with at least one shareholder. Third, at least one shareholder in such corporations must hold individually a Class A license.

According to the appellants, these requirements violate equal protection standards by irrationally discriminating against unincorporated gun clubs and facilities, and those incorporated gun clubs and facilities without any shareholders.  Noting that equal protection requires the government to afford similar treatment to similarly situated persons, the plaintiffs observe that "[a]lmost all gun clubs are membership corporations without shareholders," and that several named plaintiffs belong to gun clubs which "meet every requirement of the Act for the license except that they do not have shareholders."  They also argue that, within clubs with at least one shareholder, a person other than a shareholder should be eligible to fulfill the requirement that at least one person within the club "shall be qualified and suitable to be issued a Class A License."

## A. Applicable Legal Standards

The challenged classification is "subject only to . . . rational basis review . . . . [I]n this subset of concerns, the Equal Protection Clause requires 'that cities, states and the Federal Government must exercise their powers so as not to discriminate between their inhabitants except upon some reasonable differentiation fairly related

to the object of regulation.'" Mills v. Maine, 118 F.3d 37, 46-47 (1st Cir. 1997) (quoting Ry. Express Agency, Inc. v. New York, 336 U.S. 106, 112 (1949) (Jackson, J., concurring)). A statute passes the rational basis test "'if any reasonably conceivable set of facts could establish a rational relationship between [it] and the . . . government's legitimate ends.'" Montalvo-Huertas v. Rivera-Cruz, 885 F.2d 971, 978 (1st Cir. 1989) (quoting Tenoco Oil Co., Inc. v. Dep't of Consumer Affairs, 876 F.2d 1013, 1021 (1st Cir. 1989)). We need not inquire into the precise rationale of the legislature in enacting the statute. Indeed, "because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." FCC v. Beach Communications, Inc., 508 U.S. 307, 315 (1993).

Rational basis review does not permit courts to pass judgment on the effectiveness of the legislature's proposed classifications. "These restraints on judicial review have added force [when the legislature is] . . . defining the class of persons subject to a regulatory requirement." Id. at 316 (1993). This process "'inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact [that] the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration.'"

-35-

<u>Id.</u> at 315-316 (quoting <u>United States Railroad Retirement Bd.</u> v. <u>Fritz</u>, 449 U.S. 166, 179 (1980)).  Legislators may enact complex compromises when addressing novel social and economic issues, and "it is for the legislature, not the courts, to balance the advantages and disadvantages of the new requirement." <u>Williamson</u> v. <u>Lee Optical Co.</u>, 348 U.S. 483, 487 (1955). Cognizant of these strictures on rational basis review, we address each of the plaintiffs' equal protection challenges to this portion of the statute.

## B. The Incorporation Requirement

Incorporated entities are subject to different liability standards and types of regulation than unincorporated entities.  As the defendants argue in their brief, "the Legislature could . . . have concluded that the differences in scope of liability might make it easier for corporations to obtain insurance against the risk of injury on premises."  Given that the Secretary of State and the Attorney General regulate corporations, the legislature may also have concluded that an incorporated gun club or shooting facility is more likely to prevent the misuse of large capacity weapons than an unincorporated association.  Many federal and state laws legitimately treat corporations differently than non-corporations. <u>See</u>, <u>e.g.</u>, <u>Town of Brookline</u> v. <u>Gorsuch</u>, 667 F.2d 215, 221 n.4 (1st Cir. 1981) (focusing on the federal tax code); <u>Semler</u> v. <u>Oregon State Bd. of Dental Exam'rs</u>, 294 U.S. 608, 611 (1935) (denying corporations the right to practice

dentistry).  The different treatment here easily meets the rational basis test.

**C. Requirement that Class A Licensed Corporations Have at Least one Shareholder**

Reflecting its preference for limiting Class A club or facility licenses to entities that are subject to more formal legal requirements, the legislature may have also concluded that extant state law regulated the activities of stock corporations and their shareholders more comprehensively than it regulated non-stock corporations and their members.  "Every state['s] statute[s include] detailed provisions on the legal relations of shareholders toward each other and the corporation."  James D. Cox, Thomas Lee Hazen, & F. Hodge O'Neal, Corporations § 1.5, at 1.15 (1999 Supp.).  We find nothing irrational in the legislative judgment that such detailed provisions increase the likelihood that these stock corporations with Class A licenses will be more responsible in their use of large capacity weapons.

**D. Requirement that a Shareholder "shall be qualified and suitable to be issued a Class A License"**

The legislature may have concluded that shareholders have a greater stake in the affairs of a corporation than non-shareholders. Since the legislature was willing to permit non-members of Class A licensed clubs to use large capacity weapons on the premises of a club under the supervision of a club member who holds a Class A license,

irrespective of whether those non-members hold a license to use a large capacity weapon, the legislature may have further concluded that its concern for the responsible use of large capacity weapons at a Class A licensed gun club would be advanced if at least one of the potentially supervising club members was also a shareholder in the corporation. Although plaintiffs express considerable skepticism about the rationality of this shareholder requirement, we cannot say that the legislative requirement is irrational. In the realm of social and economic regulation, a classification passes the rational basis test "'if any reasonably conceivable set of facts could establish a rational relationship between [it] and the . . . government's legitimate ends.'" Montalvo-Huertas, 885 F.2d at 978 (quoting Tenoco Oil Co., Inc. v. Dep't of Consumer Affairs, 876 F.2d 1013, 1021 (1st Cir. 1989)). We find such a rational relationship between the shareholder requirement and the Commonwealth's evident purpose to maximize the responsible use of large capacity weapons on the premises of gun clubs with Class A licenses.

## V. Freedom of Association Challenge to Class A Licensing Provisions

Relying on the Supreme Court's recent decision in Boy Scouts of America v. Dale, 530 U.S. 640 (2000), the plaintiffs also allege that the restriction of Class A licenses to incorporated gun clubs with at least one shareholder forces them to associate with members of such clubs, in violation of their associational rights under the First

Amendment. The plaintiffs insist that "freedom of association . . . plainly presupposes a freedom not to associate." Id. at 648 (internal quotation marks omitted).

Dale is inapplicable here. In that case, the state of New Jersey required the Boy Scouts to accept gay Scout leaders, which "would, at the very least, force the organization to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior." Id. at 653. In this case the Commonwealth is only imposing a procedural, formal requirement on the structure of an organization. The statute neither requires nor even suggests any forced association of gun owners with anyone of differing views.

Furthermore, as the Commonwealth points out, requiring a club to obtain a license in order to enjoy a narrow range of privileges relating to large capacity weapons does not "implicate any constitutionally protected right of association because it does not involve . . . protected associative activity." Like an ordinance restricting attendance at certain dance halls to persons of a certain age, this regulation simply does not implicate the First Amendment. See City of Dallas v. Stanglin, 490 U.S. 19, 24 (1989) (holding that the dancing regulated by the municipal ordinance "simply [does] not involve the sort of expressive association that the First Amendment has been held to protect"). The plaintiffs are not being forced to join

any association that espouses a political viewpoint, and are not required to permit persons whose viewpoints they find objectionable to join their own association.  Therefore, their First Amendment challenge to the Class A licensing provisions is meritless.

## VI. Conclusion

Like many citizens trying to comply with a complex regulatory scheme, the plaintiffs here describe difficulties in understanding the Act.  Without minimizing their concerns, we conclude that this preenforcement challenge to the Act is not ripe for review for all of the reasons stated.  Although justiciable, their varied First Amendment and Equal Protection challenges are meritless.  We therefore affirm the decision of the district court.

**So ordered.  Each side shall bear its own costs.**