# United States Court of Appeals
## For the First Circuit

No. 03-1266

JOHN DOE I, JOHN DOE II, JOHN DOE III, JOHN DOE IV, JANE DOE I,
SUSAN E. SCHUMANN, CHARLES RICHARDSON, NANCY LESSIN, JEFFREY
MCKENZIE, JOHN CONYERS, DENNIS KUCINICH, JESSE JACKSON, JR.,
SHEILA JACKSON LEE, JIM MCDERMOTT, JOSÉ E. SERRANO, SALLY WRIGHT,
DEBORAH REGAL, ALICE COPELAND BROWN, JERRYE BARRE, JAMES STEPHEN
CLEGHORN, LAURA JOHNSON MANIS, SHIRLEY H. YOUNG, JULIAN
DELGAUDIO, ROSE DELGAUDIO, DANNY K. DAVIS, MAURICE D. HINCHEY,
CAROLYN KILPATRICK, PETE STARK, DIANE WATSON, LYNN C. WOOLSEY,

Plaintiffs, Appellants,

v.

GEORGE W. BUSH, President,
DONALD H. RUMSFELD, Secretary of Defense,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Lynch, Circuit Judge,
Cyr and Stahl, Senior Circuit Judges.

John C. Bonifaz, with whom Cristobal Bonifaz, Law
Offices of Cristobal Bonifaz, Margaret Burnham, Max D. Stern, and
Stern Shapiro Weissberg & Garin were on the brief, for
appellants.
        Michael Avery on the brief for seventy-four concerned
law professors, amici curiae.
        D. Lindley Young on the brief amicus curiae in propria
persona.

Gregory G. Katsas, Deputy Assistant Attorney General, with whom Robert D. McCallum, Jr., Assistant Attorney General, Michael J. Sullivan, United States Attorney, Douglas N. Letter, Attorney, Civil Division, Scott R. McIntosh, Attorney, Civil Division, and Teal Luthy, Attorney, Civil Division, were on the brief, for appellees.

---

March 13, 2003

---

**LYNCH**, <u>**Circuit Judge**</u>. Plaintiffs are active-duty members of the military, parents of military personnel, and members of the U.S. House of Representatives.[1] They filed a complaint in district court seeking a preliminary injunction to prevent the defendants, President George W. Bush and Secretary of Defense Donald Rumsfeld, from initiating a war against Iraq. They assert that such an action would violate the Constitution. The district court dismissed the suit, and plaintiffs appeal. We affirm the dismissal.

In October 2002, Congress passed the Authorization for Use of Military Force Against Iraq Resolution of 2002 (the "October Resolution"), Pub L. No. 107-243, 116 Stat. 1498. Plaintiffs argue that the October Resolution is constitutionally inadequate to authorize the military offensive that defendants are now planning against Iraq. <u>See</u> U.S. Const. art. I, § 8, cl. 11 (granting Congress the power "[t]o declare war"). They base this argument on two theories. They argue that Congress and the President are in collision -- that the President is about to act in violation of the October Resolution. They also argue that Congress and the

---

[1] The military personnel and some of the parents are proceeding under pseudonyms, pursuant to an order by the district court that is not before us. The members of the House of Representatives are John Conyers, Dennis Kucinich, Jesse Jackson, Jr., Sheila Jackson Lee, Jim McDermott, José E. Serrano, Danny K. Davis, Maurice D. Hinchey, Carolyn Kilpatrick, Pete Stark, Diane Watson, and Lynn C. Woolsey. We also acknowledge the assistance provided by amicus curiae on behalf of the plaintiffs.

President are in collusion -- that Congress has handed over to the President its exclusive power to declare war.

In either case, plaintiffs argue, judicial intervention is necessary to preserve the principle of separation of powers which undergirds our constitutional structure. Only the judiciary, they argue, has the constitutionally assigned role and the institutional competence to police the boundaries of the constitutional mandates given to the other branches: Congress alone has the authority to declare war and the President alone has the authority to make war.

The plaintiffs argue that important and increasingly vital interests are served by the requirement that it be Congress which decides whether to declare war. Quoting Thomas Jefferson, they argue that congressional involvement will slow the "dogs of war"; that Congress, the voice of the people, should make this momentous decision, one which will cost lives; and that congressional support is needed to ensure that the country is behind the war, a key element in any victory. They also argue that, absent an attack on this country or our allies, congressional involvement must come prior to war, because once war has started, Congress is in an uncomfortable default position where the use of its appropriations powers to cut short any war is an inadequate remedy.

The defendants are equally eloquent about the impropriety of judicial intrusion into the "extraordinarily delicate foreign affairs and military calculus, one that could be fatally upset by judicial interference." Such intervention would be all the worse here, defendants say, because Congress and the President are in accord as to the threat to the nation and the legitimacy of a military response to that threat.

The case before us is a somber and weighty one. We have considered these important concerns carefully, and we have concluded that the circumstances call for judicial restraint. The theory of collision between the legislative and executive branches is not suitable for judicial review, because there is not a ripe dispute concerning the President's acts and the requirements of the October Resolution passed by Congress. By contrast, the theory of collusion, by its nature, assumes no conflict between the political branches, but rather a willing abdication of congressional power to an emboldened and enlarged presidency. That theory is not fit for judicial review for a different, but related, reason: Plaintiffs' claim that Congress and the President have transgressed the boundaries of their shared war powers, as demarcated by the Constitution, is presently insufficient to present a justiciable issue. Common to both is our assessment that, before courts adjudicate a case involving the war powers allocated to the two political branches, they must be presented with a case or

controversy that clearly raises the specter of undermining the constitutional structure.[2]

## I.

Tensions between the United States and Iraq have been high at least since Iraq invaded neighboring Kuwait in 1990. In 1991, the United States led an international coalition in the Persian Gulf War, which drove Iraqi forces from Kuwait. Before that conflict, Congress passed a resolution quite similar to the October Resolution. See Pub. L. No. 102-1, 105 Stat. 3 (1991). As part of the ceasefire ending the Gulf War, Iraq agreed to United Nations Security Council Resolution 687, which required that Iraq end the development of nuclear, biological, and chemical weapons, destroy all existing weapons of this sort and their delivery systems, and allow United Nations weapons inspections to confirm its compliance with these terms. See S.C. Res. 687, U.N. SCOR, 46th Sess., 2981st mtg., U.N. Doc. S/RES/687 (1991). Since that time, Iraq has repeatedly been in breach of this agreement by, among other things, blocking inspections and hiding banned weapons. Iraq ended cooperation with the weapons inspection program in 1998. Since 1991, the United States and other nations have enforced a no-

---

[2] We do not reach all the issues concerning the justiciability of the case, including the question of the parties' standing. There is no required sequence to the consideration of the various non-merits issues presented here. See Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 584-85 (1999); In re Middlesex Power Equip. & Marine, Inc., 292 F.3d 61, 66 n.1 (1st Cir. 2002).

fly zone near the Kuwaiti border and on several occasions have launched missile strikes against Iraq.

Congress has been engaged in the American response to Iraqi noncompliance throughout this period. It was well-informed about ongoing American military activities, enforcement of the no-fly zone, and the missile strikes. In 1998, Congress passed a joint resolution which chronicled Iraqi noncompliance and declared that "the Government of Iraq is in material and unacceptable breach of its international obligations, and therefore the President is urged to take appropriate action, in accordance with the Constitution and relevant laws of the United States, to bring Iraq into compliance with its international obligations." Pub. L. No. 105-235, 112 Stat. 1538, 1541 (1998). Later that year, Congress also passed the Iraq Liberation Act of 1998, Pub. L. No. 105-338, 112 Stat. 3178. This statute authorized assistance, including military equipment and training, for "Iraqi democratic opposition organizations," and declared that it should be United States policy to remove Iraqi leader Saddam Hussein from power. Id. §§ 3, 4, 112 Stat. at 3179.[3]

The United Nations has also remained engaged in the dispute ever since the Persian Gulf War. It supervised weapons

---

[3] Another provision of the Iraq Liberation Act stated that, other than the military assistance provision in § 4(a)(2), the Act should not "be construed to authorize or otherwise speak to the use of United States Armed Forces." § 8, 112 Stat. at 3181. Nonetheless, this statute provides important context.

inspections, supported economic sanctions against Iraq, and, through the Security Council, repeatedly passed resolutions declaring that Iraq was not fulfilling the conditions of Resolution 687. On September 12, 2002, President Bush addressed the United Nations General Assembly. There he called for a renewed effort to demand Iraqi disarmament and indicated that he thought military force would be necessary if diplomacy continued to fail. In response, Iraq agreed to allow inspectors back into the country, but it has failed to comply fully with the earlier Security Council resolutions.

The week after his September 12 speech at the United Nations, President Bush proposed language for a congressional resolution supporting the use of force against Iraq. Detailed and lengthy negotiations between and among congressional leaders and the Administration hammered out a revised and much narrower version of the resolution. The House of Representatives passed this measure by a vote of 296 to 133 on October 10, 2002; the Senate followed suit on October 11 by a vote of 77 to 23. The full text of the October Resolution is attached as an appendix to this opinion.

On November 8, 2002, the Security Council passed Resolution 1441, which declared that Iraq remained in material breach of its obligations and offered "a final opportunity to comply with its disarmament obligations." S.C. Res. 1441, U.N.

SCOR, 57th Sess., 4644th mtg., U.N. Doc. S/RES/687 (2002). It also noted that "the Council has repeatedly warned Iraq that it will face serious consequences as a result of its continued violations of its obligations." Id. In diplomatic parlance, the phrase "serious consequences" generally refers to military action. More than 200,000 United States troops are now deployed around Iraq, preparing for the possibility of an invasion.

The complaint was filed, along with motions for preliminary injunction and expedited hearing, on February 13, 2003. The district court heard oral argument on February 24 and denied the motion in an order issued that day. The court released a more detailed written opinion on February 27. See Doe v. Bush, No. 03-10284, 2003 U.S. Dist. LEXIS 2773 (D. Mass. Feb. 27, 2003). Plaintiffs appealed and this court expedited consideration, hearing oral argument on March 4, 2003 and receiving additional briefing on March 11. Because the case was dismissed on a pretrial motion, we independently review the claims afresh.

## II.

The Constitution reserves the war powers to the legislative and executive branches. This court has declined the invitation to become involved in such matters once before. Over thirty years ago, the First Circuit addressed a war powers case challenging the constitutionality of the Vietnam War on the basis that Congress had not declared war. Massachusetts v. Laird, 451

F.2d 26 (1st Cir. 1971).  The court found that other actions by Congress, such as continued appropriations to fund the war over the course of six years, id. at 34, provided enough indication of congressional approval to put the question beyond the reach of judicial review:

> The war in Vietnam is a product of the jointly supportive actions of the two branches to whom the congeries of the war powers have been committed.  Because the branches are not in opposition, there is no necessity of determining boundaries.  Should either branch be opposed to the continuance of hostilities, however, and present the issue in clear terms, a court might well take a different view.  This question we do not face.

Id.  Applying this precedent to the case at hand today, the district court concluded, "[T]here is a day to day fluidity in the situation that does not amount to resolute conflict between the branches -- but that does argue against an uninformed judicial intervention," Doe, 2003 U.S. Dist. LEXIS 2773, at *11.  See Drinan v. Nixon, 364 F. Supp. 854, 858 (D. Mass. 1973); see also DaCosta v. Laird, 471 F.2d 1146, 1157 (2d Cir. 1973); Orlando v. Laird, 443 F.2d 1039, 1043 (2d Cir. 1971); cf. United States v. Kin-Hong, 110 F.3d 103, 111 (1st Cir. 1997) (drawing support from political question doctrine in case where "questions involve an evaluation of contingent political events").

The lack of a fully developed dispute between the two elected branches, and the consequent lack of a clearly defined issue, is exactly the type of concern which causes courts to find a case unripe.  In his concurring opinion in Goldwater v. Carter,

444 U.S. 996 (1979), Justice Powell stated that courts should decline, on ripeness grounds, to decide "issues affecting the allocation of power between the President and Congress until the political branches reach a constitutional impasse." Id. at 997 (Powell, J., concurring). A number of courts have adopted Justice Powell's ripeness reasoning in cases involving military powers. See Greenham Women Against Cruise Missiles v. Reagan, 755 F.2d 34, 37 (2d Cir. 1985) (per curiam); Dellums v. Bush, 752 F. Supp. 1141, 1150 & nn.23-25 (D.D.C. 1990); see also Sanchez-Espinoza v. Reagan, 770 F.2d 202, 210-11 (D.C. Cir. 1985) (R. Ginsburg, J., concurring).

Ripeness doctrine involves more than simply the timing of the case. It mixes various mutually reinforcing constitutional and prudential considerations. See Mangual v. Rotger-Sabat, 317 F.3d 45, 59 (1st Cir. 2003). One such consideration is the need "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." Abbott Labs. v. Gardner, 387 U.S. 136, 148 (1967). Another is to avoid unnecessary constitutional decisions. Reg'l Rail Reorganization Act Cases, 419 U.S. 102, 138 (1974). A third is the recognition that, by waiting until a case is fully developed before deciding it, courts benefit from a focus sharpened by particular facts. See Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 736 (1998). The case before us raises all three of these concerns.

-11-

These rationales spring, in part, from the recognition that the scope of judicial power is bounded by the Constitution. "It is a principle of first importance that the federal courts are courts of limited jurisdiction." C.A. Wright & M.K. Kane, Law of Federal Courts 27 (6th ed. 2002). Article III of the Constitution limits jurisdiction to "cases" and "controversies," and prudential doctrines may counsel additional restraint.

The ripeness of a dispute is determined de novo. Stern v. U.S. Dist. Court, 214 F.3d 4, 10 (1st Cir. 2000). Ripeness is dependent on the circumstances of a particular case. See Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 535 (1st Cir. 1995) ("[T]he various integers that enter into the ripeness equation play out quite differently from case to case . . . ."). Two factors are used to evaluate ripeness: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Abbot Labs., 387 U.S. at 149. Ordinarily, both factors must be present. Ernst & Young, 45 F.3d at 535.

The hardship prong of this test is most likely satisfied here; the current mobilization already imposes difficulties on the plaintiff soldiers and family members, so that they suffer "present injury from a future contemplated event." McInnis-Misenor v. Me. Med. Ctr., 319 F.3d 63, 70 (1st Cir. 2003). Plaintiffs also lack

-12-

a realistic opportunity to secure comparable relief by bringing the action at a later time.  See Ohio Forestry, 523 U.S. at 734.[4]

The fitness inquiry here presents a greater obstacle. Fitness "typically involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed." Ernst & Young, 45 F.3d at 535.  The baseline question is whether allowing more time for development of events would "significantly advance our ability to deal with the legal issues presented [or] aid us in their resolution."  Duke Power Co. v. Carolina Envtl. Study Group,  438 U.S. 59, 82 (1978); see Ohio Forestry, 523 U.S. at 737; Regional Rail, 419 U.S. at 144-45; Gun Owners' Action League v. Swift, 284 F.3d 198, 208-09 (1st Cir. 2002); R.I. Ass'n of Realtors v. Whitehouse, 199 F.3d 26, 34 (1st Cir. 1999).  "[T]he question of fitness does not pivot solely on whether a court is capable of resolving a claim intelligently, but also involves an assessment of whether it is appropriate for the court to undertake the task."  Ernst & Young, 45 F.3d at 537.  These prudential considerations are particularly strong in this case, which presents

---

[4]    Defendants, citing Ange v. Bush, 752 F. Supp. at 515, assert that no claim can ever be ripe until an attack has actually occurred.  We would be reluctant to accept this assertion; it would seem to say that a case cannot be ripe on the basis of reasonably predictable future injury.  This is not the law.  "[T]he doctrine of ripeness . . . asks whether an injury that has not yet happened is sufficiently likely to happen to warrant judicial review."  Gun Owners' Action League v. Swift, 284 F.3d 198, 205 (1st Cir. 2002) (internal quotation omitted).

a politically-charged controversy involving momentous issues, both substantively (war and peace) and constitutionally (the powers of coequal branches). See Dellums, 752 F. Supp. at 1149.

One thrust of the plaintiffs' argument is that the October Resolution only permits actions sanctioned by the Security Council.[5] In plaintiffs' view, the Resolution's authorization is so narrow that, even with Security Council approval of military force, Congress would need to pass a new resolution before United States participation in an attack on Iraq would be constitutional. At a minimum, according to plaintiffs, the October Resolution authorizes no military action "outside of a United Nations coalition."

For various reasons, this issue is not fit now for judicial review. For example, should there be an attack, Congress may take some action immediately. The purported conflict between the political branches may disappear. "[T]hat the future event may never come to pass augurs against a finding of fitness." McInnis-Misenor, 319 F.3d at 72.

Many important questions remain unanswered about whether there will be a war, and, if so, under what conditions. Diplomatic

---

[5]     Plaintiffs argue that § 3(a) of the October Resolution, which authorizes use of force to "defend the national security of the United States . . . and . . . enforce all relevant United Nations Security Council resolutions," 116 Stat. at 1501, excludes any action that is not called for by a Security Council resolution. They support their reading by reference to the October Resolution's preamble and to legislative history.

negotiations, in particular, fluctuate daily. The President has emphasized repeatedly that hostilities still may be averted if Iraq takes certain actions. The Security Council is now debating the possibility of passing a new resolution that sets a final deadline for Iraqi compliance. United Nations weapons inspectors continue their investigations inside Iraq. Other countries ranging from Canada to Cameroon have reportedly pursued their own proposals to broker a compromise. As events unfold, it may become clear that diplomacy has either succeeded or failed decisively. The Security Council, now divided on the issue, may reach a consensus. To evaluate this claim now, the court would need to pile one hypothesis on top of another. We would need to assume that the Security Council will not authorize war, and that the President will proceed nonetheless. See id. at 72-73 (outlining chain of uncertain events necessary to make case ripe); Ernst & Young, 45 F.3d at 538 (same).

Thus, even assuming that plaintiffs correctly interpret the commands of the legislative branch, it is impossible to say yet whether or not those commands will be obeyed. As was the situation in Goldwater, "[i]n the present posture of this case, we do not know whether there will ever be an actual confrontation between the Legislative and Executive Branches." 444 U.S. at 998 (Powell, J., concurring).

-15-

Our analysis is based on ripeness rather than the political question doctrine.[6] The political question doctrine -- that courts should not intervene in questions that are the province of the legislative and executive branches -- is a famously murky one. See E. Chemerinsky, Federal Jurisdiction §2.6, at 144 (3d ed. 1999) ("In many ways, the political question doctrine is the most confusing of the justiciability doctrines."). It has also been used fairly infrequently to block judicial review. The modern definition of the doctrine was established in the landmark case of

---

[6]    While the Supreme Court has not considered a modern war powers case, lower courts have, and they have reached differing conclusions about the applicability of the political question doctrine. Compare, e.g., Campbell v. Clinton, 203 F.3d 19, 37-41 (D.C. Cir. 2000) (Tatel, J., concurring) (arguing that challenge to air campaign in Yugoslavia would not pose a political question); Berk v. Laird, 429 F.2d 302, 306 (2d Cir. 1970) (holding that challenge to Vietnam War did not necessarily raise political question and remanding); Dellums, 752 F. Supp. at 1150 (rejecting argument that political question doctrine foreclosed challenge to Persian Gulf War); with Campbell, 203 F.3d at 24-28 (Silberman, J., concurring) (arguing that courts lack manageable standards to adjudicate such cases); Holtzman v. Schlesinger, 484 F.2d 1307, 1309-11 (2nd Cir. 1973) (challenge to hostilities in Cambodia rejected as political question); Ange, 752 F. Supp. at 512 (same for Persian Gulf War). See generally Laird, 451 F.2d at 29 n.2 (collecting cases); T.M. Franck, Political Questions/Judicial Answers 45-96 (1992) (tracing history of judicial abstention and lack thereof in foreign affairs and war powers cases). In some relevant older cases, the Supreme Court did reach the merits of cases concerning war. See The Prize Cases, 67 U.S. (2 Black) 635, 670-71 (1862) (finding "legislative sanction" for Civil War while reserving question of whether it was required); Talbot v. Seeman, 5 U.S. (1 Cranch) 1, 33 (1801) (Marshall, C.J.) (finding quasi-war with France authorized by Congress).

<u>Baker</u> v. <u>Carr</u>, 369 U.S. 186 (1962).[7]  In the forty years since that case, the Supreme Court has found a case nonjusticiable on the basis of the political question doctrine only twice.  <u>See</u> <u>Nixon</u> v. <u>United States</u>, 506 U.S. 224, 236 (1993) (Senate procedures for impeachment of a federal judge); <u>Gilligan</u> v. <u>Morgan</u>, 413 U.S. 1, 12 (1973) (training, weaponry, and orders of Ohio National Guard).  Our court has been similarly sparing in its reliance on the political question doctrine.[8]

Ultimately, however, the classification matters less than the principle.  If courts may ever decide whether military action contravenes congressional authority, they surely cannot do so

_____

[7]    <u>Baker</u> summarized political questions as follows:

Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

<u>Id.</u> at 217.

[8]    This court has cited the <u>Baker</u> formulation only twice besides <u>Massachusetts</u> v. <u>Laird</u>, <u>supra</u>.  One case used <u>Baker</u> to support deference to the Secretary of State in the interpretation of an extradition treaty.  <u>See</u> <u>Kin-Hong</u>, 110 F.3d at 111-12.  The other dismissed a pro se complaint objecting to the substance of Unites States foreign policy.  <u>See</u> <u>Eveland</u> v. <u>Dir. of Cent. Intelligence Agency</u>, 843 F.2d 46, 49 (1st Cir. 1988) (per curiam).

-17-

unless and until the available facts make it possible to define the issues with clarity.[9]

### III.

Plaintiffs' collusion theory presents different concerns. We understand plaintiffs to make two distinct arguments as to why an attack under the October Resolution would be unlawful. The first argument, discussed above, is that the October Resolution placed conditions on the President's authority to order action in Iraq, and that he is preparing to disregard those conditions. The other argument, our focus now, is that the October Resolution delegates excessive authority to the President, rendering it constitutionally inadequate as a vehicle for Congress to "declare war."[10]

---

[9] This conclusion does not necessarily mean that similar challenges would never be ripe for decision before military action began; we reiterate the case-specific nature of the ripeness inquiry. Here, too many crucial facts are missing.

[10] The plaintiffs appropriately disavow the formalistic notion that Congress only authorizes military deployments if it states, "We declare war." This has never been the practice and it was not the understanding of the founders. See J.H. Ely, War and Responsibility 25-26 (1993). Congressional authorization for military action has often been found in the passage of resolutions that lacked these "magic words," or in continued enactments of appropriations or extensions of the draft which were aimed at waging a particular war. See, e.g., Laird, 451 F.2d at 34 ("[I]n a situation of prolonged but undeclared hostilities, where the executive continues to act . . . with steady Congressional support, the Constitution has not been breached."); Orlando, 443 F.2d at 1042-43 ("[T]he test is whether there is any action by the Congress sufficient to authorize or ratify the military activity in question."); see also Ely, supra, at 12-46 (arguing that Congress gave constitutionally sufficient authorization for ground war in

-18-

According to this second argument, the Constitution deliberately vested power to declare war in the legislative branch as a necessary check on the power of the executive branch, and Congress is not free to upset this careful balance by giving power to the President. This claim of collusion does not align precisely with the test that the political branches have yet to reach a "constitutional impasse"; the claim is that the branches have agreed to an unconstitutional transfer of the "war declaration" powers from Congress to the President. Some initial review of the merits of the claim is "inherent when the constitutional issue is posed in terms of scope of authority." Laird, 451 F.2d at 33-34.

The Supreme Court has been willing to adjudicate other cases concerning the distribution of constitutional authority between the legislative and executive branches, notwithstanding the call for restraint embodied in the political question doctrine. Sometimes it rejects the application of the political question doctrine explicitly. See, e.g., United States v. Munoz-Flores, 495 U.S. 385, 389-96 (1990); Immigration & Naturalization Serv. v. Chadha, 462 U.S. 919, 942-43 (1983). Other times the Court has merely proceeded to the merits without explicitly rejecting the political question doctrine. See, e.g., Clinton, 524 U.S. at 421; Morrison v. Olson, 487 U.S. 654 (1988); cf. Bush v. Gore, 531 U.S. 98, 112 (2000) (Rehnquist, C.J., concurring) (considering

Vietnam and Cambodia).

-19-

separation of powers between state legislature and state judiciary under U.S. Const. art. II, § 1, cl. 2).

The Supreme Court has recognized a role for judicial review of these types of separation of powers claims even when Congress appears to have agreed to the challenged arrangement.  In Clinton v. City of New York, supra, a claim was brought by citizens deprived of the benefits of an appropriation that the President cancelled under the procedures in the Line Item Veto Act, 2 U.S.C. §§ 691-692 (2000).  These citizens argued that Congress had unconstitutionally delegated to the President its authority under the Presentment Clause, U.S. Const. art. I, § 7, cl. 2.  The Court reviewed the constitutionality of the Act despite apparent support for it from both of the other branches, which had jointly enacted the statute and used its procedures.  See Clinton, 524 U.S. at 428-36 (reviewing jurisdiction extensively without consideration of political question doctrine); see also Chadha, 462 U.S. at 941 (judicial review of legislative veto that had similarly been enacted and used).

In some ways, the claims made by plaintiffs here parallel those made in Clinton: that the Constitution vested power in the legislative branch as a necessary check on the power of the executive branch, and that Congress is not free to upset the careful balance by giving power to the executive.  See 524 U.S. at 452 (Kennedy, J., concurring)  ("That a congressional cession of

power is voluntary does not make it innocuous. . . . Abdication of responsibility is not part of the constitutional design."); cf. New York v. United States, 505 U.S. 144, 182 (1992) ("The Constitution's division of power among the three branches is violated where one branch invades the territory of another, whether or not the encroached-upon branch approves the encroachment.").

There are also, however, significant differences between Clinton and the case before us. For one, in Clinton the President had fully exercised the power that was at issue, which "removed any concern" about ripeness. 524 U.S. at 430. For another, the Line Item Veto Act contained specific provisions, accepted by both Congress and the President when they enacted the law, which not only permitted judicial review of the statute's validity but created a special expedited process for it. 2 U.S.C. § 692; see Clinton, 524 U.S. at 428-30; Raines v. Byrd, 521 U.S. 811, 815-16 (1997). There was less danger of courts invading the province of these other branches, because specific statutory authority directed them to consider the case. A third difference is the scale of the purported delegation. The Line Item Veto Act gave the President wide discretion to cancel items of discretionary budget authority, direct spending, or limited tax benefits. 2 U.S.C. § 691(a). The determinations required of the President in the October Resolution are much more narrowly focused.

Perhaps the most important difference is the shared nature of the powers in question here. The Constitution explicitly divides the various war powers between the political branches. To the Congress goes the power to "declare war," U.S. Const. art. 1, § 8, cl. 11; to "raise and support armies" through appropriations of up to two years, cl. 12; to "provide and maintain a navy," cl. 13; and to "make rules for the government and regulation of the land and naval forces," cl. 14. The President's role as commander-in-chief is one of the few executive powers enumerated by the Constitution. U.S. Const. art. II, § 2, cl. 1.

Given this "amalgam of powers," the Constitution overall "envisages the joint participation of the Congress and the executive in determining the scale and duration of hostilities." Laird, 451 F.2d at 31-32 (emphasis added). "'The great ordinances of the Constitution do not establish and divide fields of black and white.'" Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 597 (1952) (Frankfurter, J., concurring) (quoting Springer v. Philippine Islands, 277 U.S. 189, 209 (1928) (Holmes, J., dissenting)). Rather, there is sometimes a "zone of twilight in which [the President] and Congress may have concurrent authority, or in which its distribution is uncertain. . . . In this area, any actual test of power is likely to depend on the imperatives of events and contemporary imponderables rather than on abstract

-22-

theories of law." Youngstown, 343 U.S. at 637 (Jackson, J., concurring).[11]

In this zone of shared congressional and presidential responsibility, courts should intervene only when the dispute is clearly framed. See Nixon, 506 U.S. at 228-29; Baker, 369 U.S. at 217. An extreme case might arise, for example, if Congress gave absolute discretion to the President to start a war at his or her will. Cf. Clinton, 524 U.S. at 423, 425 (describing President's broad explanations for use of cancellation authority). Plaintiffs' objection to the October Resolution does not, of course, involve any such claim. Nor does it involve a situation where the President acts without any apparent congressional authorization, or against congressional opposition.

The mere fact that the October Resolution grants some discretion to the President fails to raise a sufficiently clear constitutional issue. The plaintiffs argue that Congress is

---

[11] As one commentator has said:

It is therefore an error of considerable significance to adopt uncritically an "either/or" logic -- to assume that the doctrine of separation of powers requires that power must be either in, and only in, congress or the president. Such a rigid, mechanical view has never accurately described the relationship between congress and the presidency even with respect to internal affairs; it is wholly insupportable in the area of foreign affairs. The fact is that power may inhere in both branches.

H.P. Monaghan, Presidential War-Making, 50 B.U. L. Rev. 19, 25 (1970) (special issue) (emphasis removed).

constitutionally forbidden from deciding that certain conditions are necessary to lead to war and then yielding to the President the authority to make the determination of whether those conditions exist.[12]  The President, in this view, has power to make such determinations only in the context of repelling sudden attacks on this country or its allies.  See Mitchell v. Laird, 488 F.2d 611, 613-14 (D.C. Cir. 1973).  The Supreme Court recently and forcefully reiterated that, notwithstanding the Constitution's vesting of "all legislative power" in Congress, U.S. Const. art. I, § 1 (emphasis added), enactments which leave discretion to the executive branch are permissible as long as they offer some "intelligible principle" to guide that discretion.  See Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 472-76 (2001) (quoting J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 409 (1928)).  War powers, in contrast to "all legislative power," are shared between the political branches.  Furthermore, the Supreme Court has also suggested that the nondelegation doctrine has even less applicability to foreign affairs.  See Zemel v. Rusk, 381 U.S. 1, 17 (1965) (when delegating authority over foreign relations, Congress may leave more details to the President than in domestic affairs, short of granting

---

[12]    Suppose, however, that Congress did pass a law stating simply, "The United States declares war on Iraq."  This would still leave to the President all determinations concerning timing, strategy, and tactics; the President would decide both when and how to start an attack and when and how to stop it.  See Ely, supra, at 23-25.  It is difficult to see how Congress could be said to shirk its constitutional responsibilities in that scenario.

"totally unrestricted freedom of choice").  The reference to nondelegation is thus of little help to plaintiffs in trying to present the type of serious issue necessary to overcome judicial restraint in the adjudication of war powers cases.

Nor is there clear evidence of congressional abandonment of the authority to declare war to the President.  To the contrary, Congress has been deeply involved in significant debate, activity, and authorization connected to our relations with Iraq for over a decade, under three different presidents of both major political parties, and during periods when each party has controlled Congress.  It has enacted several relevant pieces of legislation expressing support for an aggressive posture toward Iraq, including authorization of the prior war against Iraq and of military assistance for groups that would overthrow Saddam Hussein.  It has also accepted continued American participation in military activities in and around Iraq, including flight patrols and missile strikes.  Finally, the text of the October Resolution itself spells out justifications for a war and frames itself as an "authorization" of such a war.

It is true that "courts possess power to review either legislative or executive action that transgresses identifiable textual limits" on constitutional power.  Nixon, 506 U.S. at 238. Questions about the structure of congressional power can be justiciable under the proper circumstances.  See, e.g., Clinton,

524 U.S. at 428-36; <u>Chadha</u>, 462 U.S. at 941-44.  But courts are rightly hesitant to second-guess the form or means by which the coequal political branches choose to exercise their textually committed constitutional powers.  <u>See</u> <u>Orlando</u>, 443 F.2d at 1043.  As the circumstances presented here do not warrant judicial intervention, the appropriate recourse for those who oppose war with Iraq lies with the political branches.

Dismissal of the complaint is **affirmed**.

AUTHORIZATION FOR USE OF MILITARY
FORCE AGAINST IRAQ RESOLUTION OF 2002

Public Law 107–243
107th Congress

## Joint Resolution

Oct. 16, 2002

[H.J. Res. 114]

To authorize the use of United States Armed Forces against Iraq.

Whereas in 1990 in response to Iraq's war of aggression against and illegal occupation of Kuwait, the United States forged a coalition of nations to liberate Kuwait and its people in order to defend the national security of the United States and enforce United Nations Security Council resolutions relating to Iraq;

Whereas after the liberation of Kuwait in 1991, Iraq entered into a United Nations sponsored cease-fire agreement pursuant to which Iraq unequivocally agreed, among other things, to eliminate its nuclear, biological, and chemical weapons programs and the means to deliver and develop them, and to end its support for international terrorism;

Whereas the efforts of international weapons inspectors, United States intelligence agencies, and Iraqi defectors led to the discovery that Iraq had large stockpiles of chemical weapons and a large scale biological weapons program, and that Iraq had an advanced nuclear weapons development program that was much closer to producing a nuclear weapon than intelligence reporting had previously indicated;

Whereas Iraq, in direct and flagrant violation of the cease-fire, attempted to thwart the efforts of weapons inspectors to identify and destroy Iraq's weapons of mass destruction stockpiles and development capabilities, which finally resulted in the withdrawal of inspectors from Iraq on October 31, 1998;

Whereas in Public Law 105–235 (August 14, 1998), Congress concluded that Iraq's continuing weapons of mass destruction programs threatened vital United States interests and international peace and security, declared Iraq to be in "material and unacceptable breach of its international obligations" and urged the President "to take appropriate action, in accordance with the Constitution and relevant laws of the United States, to bring Iraq into compliance with its international obligations";

Whereas Iraq both poses a continuing threat to the national security of the United States and international peace and security in the Persian Gulf region and remains in material and unacceptable breach of its international obligations by, among other things, continuing to possess and develop a significant chemical and biological weapons capability, actively seeking a nuclear weapons capability, and supporting and harboring terrorist organizations;

Whereas Iraq persists in violating resolution of the United Nations Security Council by continuing to engage in brutal repression of its civilian population thereby threatening international peace

and security in the region, by refusing to release, repatriate, or account for non-Iraqi citizens wrongfully detained by Iraq, including an American serviceman, and by failing to return property wrongfully seized by Iraq from Kuwait;

Whereas the current Iraqi regime has demonstrated its capability and willingness to use weapons of mass destruction against other nations and its own people;

Whereas the current Iraqi regime has demonstrated its continuing hostility toward, and willingness to attack, the United States, including by attempting in 1993 to assassinate former President Bush and by firing on many thousands of occasions on United States and Coalition Armed Forces engaged in enforcing the resolutions of the United Nations Security Council;

Whereas members of al Qaida, an organization bearing responsibility for attacks on the United States, its citizens, and interests, including the attacks that occurred on September 11, 2001, are known to be in Iraq;

Whereas Iraq continues to aid and harbor other international terrorist organizations, including organizations that threaten the lives and safety of United States citizens;

Whereas the attacks on the United States of September 11, 2001, underscored the gravity of the threat posed by the acquisition of weapons of mass destruction by international terrorist organizations;

Whereas Iraq's demonstrated capability and willingness to use weapons of mass destruction, the risk that the current Iraqi regime will either employ those weapons to launch a surprise attack against the United States or its Armed Forces or provide them to international terrorists who would do so, and the extreme magnitude of harm that would result to the United States and its citizens from such an attack, combine to justify action by the United States to defend itself;

Whereas United Nations Security Council Resolution 678 (1990) authorizes the use of all necessary means to enforce United Nations Security Council Resolution 660 (1990) and subsequent relevant resolutions and to compel Iraq to cease certain activities that threaten international peace and security, including the development of weapons of mass destruction and refusal or obstruction of United Nations weapons inspections in violation of United Nations Security Council Resolution 687 (1991), repression of its civilian population in violation of United Nations Security Council Resolution 688 (1991), and threatening its neighbors or United Nations operations in Iraq in violation of United Nations Security Council Resolution 949 (1994);

Whereas in the Authorization for Use of Military Force Against Iraq Resolution (Public Law 102–1), Congress has authorized the President "to use United States Armed Forces pursuant to United Nations Security Council Resolution 678 (1990) in order to achieve implementation of Security Council Resolution 660, 661, 662, 664, 665, 666, 667, 669, 670, 674, and 677";

Whereas in December 1991, Congress expressed its sense that it "supports the use of all necessary means to achieve the goals of United Nations Security Council Resolution 687 as being consistent with the Authorization of Use of Military Force Against

Iraq Resolution (Public Law 102–1)," that Iraq's repression of its civilian population violates United Nations Security Council Resolution 688 and "constitutes a continuing threat to the peace, security, and stability of the Persian Gulf region," and that Congress, "supports the use of all necessary means to achieve the goals of United Nations Security Council Resolution 688";

Whereas the Iraq Liberation Act of 1998 (Public Law 105–338) expressed the sense of Congress that it should be the policy of the United States to support efforts to remove from power the current Iraqi regime and promote the emergence of a democratic government to replace that regime;

Whereas on September 12, 2002, President Bush committed the United States to "work with the United Nations Security Council to meet our common challenge" posed by Iraq and to "work for the necessary resolutions," while also making clear that "the Security Council resolutions will be enforced, and the just demands of peace and security will be met, or action will be unavoidable";

Whereas the United States is determined to prosecute the war on terrorism and Iraq's ongoing support for international terrorist groups combined with its development of weapons of mass destruction in direct violation of its obligations under the 1991 cease-fire and other United Nations Security Council resolutions make clear that it is in the national security interests of the United States and in furtherance of the war on terrorism that all relevant United Nations Security Council resolutions be enforced, including through the use of force if necessary;

Whereas Congress has taken steps to pursue vigorously the war on terrorism through the provision of authorities and funding requested by the President to take the necessary actions against international terrorists and terrorist organizations, including those nations, organizations, or persons who planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such persons or organizations;

Whereas the President and Congress are determined to continue to take all appropriate actions against international terrorists and terrorist organizations, including those nations, organizations, or persons who planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such persons or organizations;

Whereas the President has authority under the Constitution to take action in order to deter and prevent acts of international terrorism against the United States, as Congress recognized in the joint resolution on Authorization for Use of Military Force (Public Law 107–40); and

Whereas it is in the national security interests of the United States to restore international peace and security to the Persian Gulf region: Now, therefore, be it

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,*

Authorization for Use of Military Force Against Iraq Resolution of 2002.
50 USC 1541 note.

## SECTION 1. SHORT TITLE.

This joint resolution may be cited as the "Authorization for Use of Military Force Against Iraq Resolution of 2002".

**SEC. 2. SUPPORT FOR UNITED STATES DIPLOMATIC EFFORTS.**

The Congress of the United States supports the efforts by the President to—

(1) strictly enforce through the United Nations Security Council all relevant Security Council resolutions regarding Iraq and encourages him in those efforts; and

(2) obtain prompt and decisive action by the Security Council to ensure that Iraq abandons its strategy of delay, evasion and noncompliance and promptly and strictly complies with all relevant Security Council resolutions regarding Iraq.

**SEC. 3. AUTHORIZATION FOR USE OF UNITED STATES ARMED FORCES.**

(a) AUTHORIZATION.—The President is authorized to use the Armed Forces of the United States as he determines to be necessary and appropriate in order to—

(1) defend the national security of the United States against the continuing threat posed by Iraq; and

(2) enforce all relevant United Nations Security Council resolutions regarding Iraq.

(b) PRESIDENTIAL DETERMINATION.—In connection with the exercise of the authority granted in subsection (a) to use force the President shall, prior to such exercise or as soon thereafter as may be feasible, but no later than 48 hours after exercising such authority, make available to the Speaker of the House of Representatives and the President pro tempore of the Senate his determination that—

(1) reliance by the United States on further diplomatic or other peaceful means alone either (A) will not adequately protect the national security of the United States against the continuing threat posed by Iraq or (B) is not likely to lead to enforcement of all relevant United Nations Security Council resolutions regarding Iraq; and

(2) acting pursuant to this joint resolution is consistent with the United States and other countries continuing to take the necessary actions against international terrorist and terrorist organizations, including those nations, organizations, or persons who planned, authorized, committed or aided the terrorist attacks that occurred on September 11, 2001.

(c) WAR POWERS RESOLUTION REQUIREMENTS.—

(1) SPECIFIC STATUTORY AUTHORIZATION.—Consistent with section 8(a)(1) of the War Powers Resolution, the Congress declares that this section is intended to constitute specific statutory authorization within the meaning of section 5(b) of the War Powers Resolution.

(2) APPLICABILITY OF OTHER REQUIREMENTS.—Nothing in this joint resolution supersedes any requirement of the War Powers Resolution.

**SEC. 4. REPORTS TO CONGRESS.**

(a) REPORTS.—The President shall, at least once every 60 days, submit to the Congress a report on matters relevant to this joint resolution, including actions taken pursuant to the exercise of authority granted in section 3 and the status of planning for efforts that are expected to be required after such actions are completed, including those actions described in section 7 of the Iraq Liberation Act of 1998 (Public Law 105–338).

President.

(b) SINGLE CONSOLIDATED REPORT.—To the extent that the submission of any report described in subsection (a) coincides with the submission of any other report on matters relevant to this joint resolution otherwise required to be submitted to Congress pursuant to the reporting requirements of the War Powers Resolution (Public Law 93–148), all such reports may be submitted as a single consolidated report to the Congress.

(c) RULE OF CONSTRUCTION.—To the extent that the information required by section 3 of the Authorization for Use of Military Force Against Iraq Resolution (Public Law 102–1) is included in the report required by this section, such report shall be considered as meeting the requirements of section 3 of such resolution.

Approved October 16, 2002.

LEGISLATIVE HISTORY—H.J. Res. 114 (S.J. Res. 45) (S.J. Res. 46):

HOUSE REPORTS: No. 107–721 (Comm. on International Relations).
CONGRESSIONAL RECORD, Vol. 148 (2002):
    Oct. 8, 9, considered in House.
    Oct. 10, considered and passed House and Senate.
WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 38 (2002):
    Oct. 16, Presidential remarks and statement.

○